ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION
This matter is before the court on the motion of Defendant (taxpayer) for reconsideration of the court's order issued on October 26, 2010. Plaintiff (the department) opposes the motion. The court has received the briefs of the parties on the matter and benefited from a hearing on the motion.
Taxpayer first argues that in its analysis the court incorrectly concluded that there were two transactions, those being a first transaction between the Share Case Plaintiffs and the *Page 2 
Director Defendants and the second being a transaction between the Director Defendants and taxpayer.[1] Taxpayer then argues that the court overlooked an important third transaction, the actual sale of stock. Taxpayer states that this third transaction occurred first in time and "occurred because the Share Case Plaintiffs as shareholders were bound by [taxpayer's] right of first refusal found in its bylaws." (Def's Mot for Recons at 1.)
The record in this case simply does not support these assertions made by taxpayer. Without question, the first determinative event in this case was not the exercise of any right of first refusal, a right that by its terms required a predicate event — a proposed disposition of stock subject to the right of refusal. (Stip Ex 49 at 16.) The first determinative event was, therefore, the entry of the Share Case judgment. Absent that event, the right of first refusal could not have been triggered.[2]
The judgment determined what taxpayer had a right to buy, whether by exercise of the refusal rights or by assignment of the rights of the Director Defendants under the Settlement Agreement, and the price to be paid. The source of the right to purchase, either the right of refusal or the rights, and obligations, created by the Settlement Agreement, could not and did not affect the substance of what was purchased. As stated in the order in this matter, the judgment called for only two events: transfer of shares and payment of money. No other agreements among other parties, neither the bylaws of taxpayer nor the Settlement Agreement among the Director Defendants and taxpayer, could change that basic fact. What the judgment allowed and *Page 3 
required was only a purchase of stock — a certain number of shares for a certain cash payment. (Stip Ex F at 2-3.) That reality was not transmogrified by the side transactions and self-serving characterizations of taxpayer and others, none of which, by the agreement of the parties to those transactions and characterizations, were binding for federal income tax purposes. (Stip Ex J at 7.) At the end of the day, whoever discharged the judgment paid for nothing but stock and was entitled to receive nothing but stock.
Ironically, the focus of taxpayer on the right of refusal is inconsistent with its position that in paying the judgment amount taxpayer was paying for something other than its own stock. The right of refusal related only to shares of stock in taxpayer. (Stip Ex C at 11-12.) In exercising its rights of first refusal taxpayer neither received any right to acquire something else nor obligated itself to acquire something else or perform any other act. To the extent that the corporation employed its right of first refusal to step into the shoes of the Director Defendants, it only put itself in the position of paying the judgment amount and receiving its own stock.
Perhaps recognizing this inescapable reality, taxpayer further argues that the payment made for the stock must be bifurcated "internally" between a portion for the value of the stock at the time of the judgment and a separate portion for damages done to the Share Case Plaintiffs or their stock as a result of the actions of the Director Defendants. (Def's Mot for Recons at 2, 6.) The major premise of this position is that a portion of the special verdict of the jury in the Share Case establishes the value of the stock at the time of the satisfaction of the judgment, with the rest constituting payment for the damages suffered by the Share Case Plaintiffs. (Id. at 6-7.) This premise ignores the fact that the special verdict did not become the operative judicial action in the underlying case. Rather, the special verdict and actions of the jury were overridden by the action of the judge in requiring the Share Case Plaintiffs to transfer shares if they were to receive cash, the actions of the same judge in the remittitur stage, and the resulting judgment. That *Page 4 
judgment did not outline two elements to the stock purchase. Unless avoided by appeal by the Director Defendants or rejected by the Share Case Plaintiffs, neither of which occurred, the judgment entered by the court called only for transfer of stock and payment of the judgment amount. (Stip Ex F at 2-3.)
Further, taxpayer cites to no statutory, regulatory or case law authority for its position that one payment for shares, the value of which has been reduced by the action of a payor or one in whose shoes a payor stands, is somehow to be considered, for purposes of IRC section 162(k), as something other than a payment for stock.[3] It is appropriate to test taxpayer's argument against the statute and evidence of Congressional intent in adopting the statute.
Section 162(k) was added to the IRC in 1986 to clarify the deductibility of redemption payments following some divergent judicial outcomes and the appearance of new corporate takeover transactions. Staff of Joint Committee on Taxation, 100th Congress,General Explanation of the Tax Reform Act of1986 at 277 (Committee Print 1987). One transaction clearly in the sights of the Congress was a so-called "greenmail" payment made to redeem shares held by persons who threatened a takeover of the company. Id. at 277-78. Congress intended to bar any deduction for redemption payments in such situations, including any premium that might be paid to the threatening shareholders.Id.[4] *Page 5 
It is clear that the Congress intended to reject the position, adopted by at least one court, that redemption payments could be deductible on the theory that they were, in whole or in part, something else — specifically payments to preserve the existence of the business. Id. at 277. The efforts of taxpayer here to describe redemption payments as something else, and something deductible, are really no different from the analytical position the Congress rejected.
It is true that the Congress in 1986 intended to allow certain otherwise deductible payments to be deductible even though they were coincident in time with the redemption of shares.Id. at 278. But that was only to be allowed when there was another transaction involving otherwise deductible payments, and then only when such other transaction had "no nexus with the redemption other than being proximate in time or arising out of the same general circumstances." Id. The "proximate in time" rule precludes any position that one payment made at one time can contain two elements. Rather, the legislative history of the provision shows that some other relationship or transaction in addition to the redemption of stock must be involved if a portion of a payment is to be deductible. Id.
In this case there simply is no such other transaction occurring between the sellers and the buyer or buyers of the stock. There is certainly no transaction without nexus or fundamental connection to the redemption. The Share Case Plaintiffs were not creditors or employees with claims against the Director Defendants or taxpayer. The only transaction in which the Share Case Plaintiffs participated was the sale of stock and all payments had a nexus with, and only with, that sale. Once taxpayer took over the position of the Director Defendants, the sale became a redemption of shares. It is the case that the redemption coincidentally did away with most, but *Page 6 
not all, of the potential claims of the Defendant Directors for indemnification.[5] That is because the obligation of those defendants was to purchase stock. But in taking over that obligation, taxpayer made a payment of cash that had the effect of reducing the total number of outstanding shares of the company. It recorded that transaction for accounting purposes entirely as a change in the capital accounts of the company and it assured its shareholders that it had not paid more for the stock than the value of the stock. In other words, there were no actions that did not have nexus with the redemption of the shares.
Perhaps the best indication of the complete and total linkage between the claims of the Share Case Plaintiffs and the stock is in the action of the Share Case trial court judge. Recall that the judge required that all shares of stock be surrendered in connection with recovery of any money by the Share Case Plaintiffs. (Stip Ex F at 2-3.) All claims were thus effectively merged into the shares held by the Share Case Plaintiffs. Those claims and all payments made in respect of those claims had a nexus with and only with the stock. The legislative history of IRC section 162(k) demonstrates that the Congress adopted the views of the United States Supreme Court from the case of Woodward v.Commissioner, 397 US 572, 25 L Ed 2d 577 (1970). GeneralExplanation at 277-78. It is well to remember that the rule of IRC section 162(k) is a rule of capitalization and prevention of current deduction. It is also well to remember what the Supreme Court said in Woodward:
 "[W]herever a capital asset is transferred to a new owner in exchange for value either agreed upon or determined by law to be a fair quid pro quo, the payment itself is a capital expenditure."
397 US at 579 n 8. What occurred in this case was a transfer of shares in taxpayer to a new owner for a value determined in a legal proceeding to be a fair quid pro quo. The payment by *Page 7 
taxpayer was a non-deductible capital expenditure described in and governed by IRC section 162(k).
At the hearing on this matter taxpayer also focused on an argument that the order of the court would produce collateral tax problems, indicating that the court's resolution of the primary question was incorrect. The collateral tax problems had to do with the consequences that the court's analysis would have in the case of purchases of damaged property, other than stock of a corporation purchased by that corporation, by a tortfeasor and later sale of that property. Those supposed consequences result from the federal tax rules regarding computation of the basis of purchased assets. Without accepting that any such problems would in fact exist, this argument of taxpayer is without merit, as stock of a corporation is a special asset in the hands of that corporation. The basis of the stock purchased will never be relevant as a corporation recognizes no gain or loss in transactions involving its own shares. IRC § 1032(a). Therefore, a corporation, including taxpayer, has no occasion to inquire into the basis, in its hands, of its own stock.
The other arguments of taxpayer for reconsideration are not substantially different from those raised prior to the decision in this case. Now, therefore,
IT IS ORDERED THAT Defendant's Motion for Reconsideration is allowed. The decision of the court is adhered to as rendered, with the additional support for the decision as set forth above.
The case is continued in accordance with the court's order issued on October 26, 2010.
Dated this ___ day of March, 2011.
THIS DOCUMENT WAS SIGNED BY JUDGE HENRY C. BREITHAUPTON MARCH 28, 2011, AND FILED THE SAME DAY. THIS IS A PUBLISHEDDOCUMENT.
[1] "Share Case Plaintiffs," "Director Defendants," and all other defined terms are used and defined here as in the court's order of October 26, 2010.
[2] As the court stated in footnote 2 of the order of October 26, 2010, it is not clear to the court whether taxpayer ever unequivocally asserted that it bought pursuant to the right of refusal as opposed to pursuant to the assignment of rights of the Director Defendants under the Settlement Agreement. That distinction, however, is without particular relevance because neither the subject of the sale nor the amount paid is changed by reason of the source of the right to purchase.
[3] All references to the Internal Revenue Code (IRC) are to the 1996 edition.
[4] It is interesting to note that the origin of the difficulties that led to the Share Case Judgment bore significant similarities to the type of transaction on which Congress was particularly focused in 1986. Recall that the Share Case Plaintiffs, seeking liquidity for their investment, had incurred the ire of the incumbent management of taxpayer and the Director Defendants by proposing to find a buyer for the company or creating a public market for the shares of taxpayer in which such a takeover could more easily occur. The Director Defendants' wrongful actions were designed to ward off just the sort of hostile moves that could lead to "greenmail" transactions. In the end, taxpayer made significant payments to the people who threatened the position of incumbent management. The payments made were the result of judicial action and not voluntarily — like "greenmail" payments generally — to ward off an unwanted result. The court sees no reason why this difference should prevent the court from analogizing this case to those considered by Congress.
[5] The Director Defendants reserved rights to claim for other costs. (Stip Ex J at 7.) *Page 1